

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-18-00235-CV

———————————————————

IN THE INTEREST OF A.S. AND A.S., CHILDREN

No. 02-18-00236-CV

———————————————————

IN THE INTEREST OF A.S., A CHILD

On Appeal from the 323rd District Court
Tarrant County, Texas
Trial Court No. 323-104278-16
Trial Court No. 323-106105-17

Before Gabriel, Kerr, and Pittman, JJ.
Memorandum Opinion by Justice Kerr

# MEMORANDUM OPINION

Mother appeals the termination of her parental rights to Andrew and Bruce in cause number 02-18-00235-CV and to Charles in cause number 02-18-00236-CV. *See* Tex. Fam. Code Ann. § 161.001(b). Asserting the same ground of error in both cases, Mother asserts that the evidence is both legally and factually insufficient to support the trial court's findings that termination was in the children's best interest. We affirm.

## I. Preliminary Matters

To protect the parties' privacy in this case, we identify the children, their presumed father, and their alleged father by fictitious names and their mother and maternal grandmother simply as Mother and Maternal Grandmother, respectively. *See id.* § 109.002(d).

The suit involving Andrew and Bruce is trial court cause number 323-104278-16, styled *In the Interest of A.S. and A.S., Children.* While that case was pending, Mother gave birth to Charles; his case proceeded under trial court cause number 323-106105-17, styled *In the Interest of A.S., a Child.* The trial court tried the two cases together.

Procedurally, the cases were further complicated because all three boys had both a presumed father (Paul, whom Mother had married and separated from in 2011 but whom she had never divorced) and an alleged father (Fred, whom Mother identified as the children's father). In Andrew and Bruce's case, when genetic testing excluded Paul as their father, the trial court dismissed him, and after the bench trial, the trial court terminated Fred's parental rights to both boys. In the companion case

involving Charles, Paul did not submit to genetic testing, so after the joint bench trial, the trial court terminated both Paul's and Fred's parental rights to him. Neither Paul nor Fred has appealed.

## II. Mother's Contention

Mother asserts the same ground of error—evidentiary sufficiency—in each appeal and includes a public-policy argument in the course of her analysis: the Texas Department of Family and Protective Services' initial plan was to make Maternal Grandmother the children's managing conservator and not terminate Mother's parental rights, but after the Department determined that Maternal Grandmother had access to greater financial benefits as an adoptive parent than as a managing conservator, the Department changed its plan to terminating Mother's parental rights and having Maternal Grandmother adopt the children.

Although not a discrete ground of error, Mother asserts that as a matter of public policy this financial reason does not satisfy the Department's burden of proving best interest by clear and convincing evidence.

## III. The Evidence

### A. Mother's parental rights to her daughter are terminated in 2014; Mother gives birth to Andrew in 2015.

In 2012, Mother gave birth to Sissy—Andrew, Bruce, and Charles's older sister. But in 2014, the Department terminated Mother's parental rights to Sissy, whom Maternal Grandmother later adopted. Among the grounds listed in the termination

decree were endangerment findings under § 161.001(b)(1)(D) and (E) of the family code. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E).

The following year, in 2015, Mother gave birth to Andrew.

## B. Mother engages in Family-Based Safety Services in 2016.

In February the next year, Fred allegedly went to Mother's home, assaulted her, and tried to stab her; at the time, Mother already had a protective order in place against Fred. The Department assigned Marissa Tafolla to investigate.

Tafolla went to Mother's home twice but no one answered, and when she went to Mother's leasing office, someone there told her that Mother was no longer a resident. Despite being familiar with each other because Mother had had previous cases in 2015, when Tafolla telephoned, Mother refused to meet her or to allow her to see Andrew.

To locate Mother, the Department then employed a special investigator who, after finding her, went to Mother's home; Mother still refused to cooperate. But when Tafolla herself went to Mother's home, Mother allowed her to see Andrew, so the Department decided to seek court-ordered services, the goal of which was to have Mother complete services, keep Andrew in the home, and keep Andrew safe.

And in July or early August 2016, the Department did just that. As part of Family-Based Safety Services (FBSS),[1] the trial court ordered Mother to complete

---

[1] *See id.* § 264.204 (addressing services for less serious cases).

4

domestic-violence and mental-health counseling and to complete a psychological evaluation.

After the court ordered these services, Tafolla visited Mother's home one time. Mother acknowledged to Tafolla that domestic violence between her and Fred was occurring, but Mother attributed it to Fred's losing his job and drinking a lot. At the time Tafolla investigated Fred, he had a pending criminal charge involving an assault on Mother, but Tafolla did not know its outcome.

In August 2016, when FBSS worker Anthony Roberson II contacted Mother, she was pregnant. Later that month, Mother gave birth to Bruce.

Completing her in-home counseling and her psychological evaluation, Mother participated in her court-ordered services.

But in November, the Department received multiple allegations that Fred had moved back in with Mother, that Mother was displaying anger, and that domestic violence was occurring—specifically that a television had been thrown. Roberson went to Mother's home to make sure Fred was not there and to explain to Mother that if he was, the Department would likely remove her children. During the home visit, Roberson noticed that the television was missing, but Mother explained its absence by saying that it no longer worked.

On another occasion when Mother's in-home counselor, Kimberly Dunn-Lipscomb, went to Mother's home, from the parking lot Dunn-Lipscomb heard Mother screaming that she was going to beat somebody up. Despite denying the

5

incident to Roberson, Mother nevertheless agreed to counseling to address anger issues.

## C. The Department removes the children.

On December 28, Dunn-Lipscomb contacted Roberson about a disturbing text that Mother had sent her. In that text, Mother had expressed suicidal ideations; she "wanted God to come take her and the kids." The next day, Dunn-Lipscomb went to Mother's home but was not allowed in; Dunn-Lipscomb could hear the children crying inside the house.[2]

Roberson, his supervisor, and a police officer who came along to do a welfare check also went to Mother's home, where they heard a baby screaming but could not hear Mother. Suddenly they heard Mother erupt in a volley of cursing and name-calling; eventually, while holding the baby, Mother cracked the door open. After the officer opened the door, Mother agreed to put the baby down on the sofa while everyone talked. But after Mother put the baby down, she took a swing at the officer, and—as Roberson put it—"the officer took her down from there." They later found Fred hiding in the closet, and when Roberson asked him why he was hiding, Fred answered that he did not want CPS to remove his children.

---

[2]The affidavit supporting the Department's petition contains a transcription of Mother's text. Mother sent the text during the evening of December 28, which appears to explain why the events leading to the removal occurred the next day.

Mother wanted her brother to take care of Andrew and Bruce, but Roberson's attempts to contact him failed, and when Mother refused to place her children with Maternal Grandmother, the Department placed Andrew and Bruce in foster care. Completing the removal, the trial court later named the Department as Andrew and Bruce's temporary managing conservator.

## D. After the removal, the Department weighs its options and decides to seek termination and adoption.

### 1. The caseworker recommends termination.

#### a. Mother's domestic-violence and mental-health issues frustrate her caseworker.

Karen Soto was the Department's conservatorship caseworker for Mother, Andrew, and Bruce. Just as in the FBSS case, the Department wanted Mother to address domestic-violence issues and her mental-health situation.

But Mother denied any ongoing domestic violence, and when Soto confronted Mother with Mother's own reports accusing Fred of domestic violence, Mother responded that the reports were lies. Despite her denials, Mother completed her domestic-violence classes through SafeHaven in December 2017. When Soto later asked Mother what she had learned, Mother responded that she had not learned anything because none of it applied to her.

For mental-health issues, Mother attended MHMR,[3] but Soto was not satisfied with Mother's documentation, elaborating, "[Mother] has provided me with two documentations stating that she has been out to see MHMR but I've had this case since 2017.[4] . . . I constantly, throughout the case, asked for documentation of her medication or I reached out to MHMR and there was never any consistency."

Mother was allowed to visit the children while they were in Maternal Grandmother's care. At first, the Department supervised the visits, but Maternal Grandmother began to supervise them. Although the visits generally went well, one visit was cut short when Mother became aggressive. Soto stated that Mother was still putting her children at risk with her aggressive behavior.

Soto described Mother as uncooperative with services. Throughout the case, Mother maintained that she did not understand why her children were in care. Mother acknowledged that domestic violence was a danger to her children but denied that any domestic violence was occurring. Mother also asserted that because Fred was the children's father, she was not going to keep him away. Soto agreed that Mother was not protective and did not understand the need for protection.

Soto testified that the Department was seeking termination because of the concerns for ongoing domestic violence that Mother consistently denied despite the

---

[3]Mental Health Mental Retardation. *See In re S.L.S.*, No. 02-04-00186-CV, 2005 WL 250688, at *3 (Tex. App.—Fort Worth Feb. 3, 2005 no pet.) (mem. op.).

[4]Soto received the case in January 2017 and testified on June 28, 2018.

police reports. The Department had also received calls from family members complaining that Mother was behaving aggressively and police reports stating that Mother was in jail for assaulting a family member. Soto's other concern was Mother's mental health, which she felt had never been addressed.

### b. Mother and Fred's relationship remains cloudy.

In the beginning, Mother and Fred stated that they were a couple and wanted to work on their relationship, so the Department wanted to provide family therapy to work through the domestic-violence issues. But in the middle of the case, Mother and Fred stated that they were no longer in a relationship and no longer wanted to work together.

Soto last saw Fred in the Tarrant County jail in October 2017 after he had been arrested for an unspecified "possession" and a robbery.

Mother gave birth to Charles in October 2017.[5] When Soto asked, Mother admitted that Fred had been at the hospital for Charles's birth and identified Fred as Charles's father, but she denied having an ongoing relationship with him.

Although Mother and Fred told Soto that their relationship had ended in March 2017, Soto continued to receive information that they were still seeing each other. Soto last saw them together in June 2017 and noted that Fred had been to jail twice since that time. Nothing suggested that they were back together at the time of

---

[5]The trial court appointed the Department as his temporary managing conservator a few days later.

trial, Soto acknowledged, or that the children were ever physically injured during any of the disputes. But she added that when the children came into care, they were "[m]entally not so well." Mother had not been able to provide the children a safe environment.

### c. The caseworker feared that Mother was considering letting a man with an assault conviction live with her.

In May,[6] text messages showed that Mother was possibly considering having a person who was currently in prison for assault move in with her, which concerned Soto because Mother was considering introducing someone not well-suited for her children into her family. When Soto spoke to Mother about the texts, Mother responded that it was none of Soto's business, that Mother was a grown person, and that the people Mother talked to was Mother's concern. Although Soto had seen the outside of Mother's current residence, she had not been inside because Mother had not allowed her in, so Soto had no way of knowing if anyone else was living with her.

### d. Andrew exhibited violent behavior and delayed speech after his removal but improved while in Maternal Grandmother's care.

The Department placed Andrew, Bruce, and Charles with Maternal Grandmother, who also had Sissy. Soto described all the children as doing very well in Maternal Grandmother's home. Initially, Andrew behaved aggressively—throwing toys and hitting other children and himself—and was delayed in his speech. But Soto

---

[6]Soto appears to be referring to May 2018. In May 2017, Mother was pregnant with Charles.

stated that "[s]ince he's been there, now he's a completely different child. He's able to talk to you. He doesn't hit." Maternal Grandmother provided the children with a very safe environment and engaged them in play therapy and any other follow-up services that they needed, including "ECI."[7] Soto explained that Bruce was referred to ECI to work on his motor skills. She described Charles as "a perfect baby," growing and developing as he should.

Maternal Grandmother was able to provide for the children, had a stable home, and was meeting all their medical needs. Soto had no concerns with the placement. Although the Department had concerns initially with Andrew because of delays in his motor skills and his speech, he was currently "doing really great." According to Soto, "He's actually – he's thriving in that home. He's talking, he's interacting well with others, his behavior has definitely completely changed from when he came into care." All three children had bonded with Sissy. The plan was for Maternal Grandmother to adopt the children, which Soto thought was in the children's best interest.

### e. The Department opts for termination and adoption rather than leaving Mother's parental rights intact and making Maternal Grandmother the children's managing conservator.

Soto agreed that at one time the Department's plan was managing conservatorship to Maternal Grandmother, but its plan changed to asking the trial court to award termination when Maternal Grandmother's husband's history ran afoul

---

[7]Early Childhood Intervention. *See In re E.P.C.*, 381 S.W.3d 670, 677 (Tex. App.—Fort Worth 2012, no pet.).

of the Fostering Connections Program's regulations. Because Maternal Grandmother had successfully adopted Sissy, and because the Department did not want Maternal Grandmother to struggle while providing for four children, the Department opted for adoption and the additional help that Maternal Grandmother could receive as an adoptive parent.

### 2. Maternal Grandmother recommends termination.

Maternal Grandmother testified that she had Andrew, Bruce, and Charles in her home as well as Sissy, whom she had already adopted, and asked the court to terminate Mother's parental rights; she explained, "I feel like [Mother] loves her children[,] but her motherly instincts are not . . . up to par . . . ." Maternal Grandmother also stated that Mother wanted Fred in the children's lives; Maternal Grandmother did not think that was healthy. She added that the children "love their mom and she loves them but as far as her providing for them and even just not having the violent outbursts or the episodes, I don't think she's ready for that." She was concerned for the children's safety if they were returned to Mother. When asked whether she made her decision lightly, Maternal Grandmother answered, "No[,] because when the case is closed, that's still my daughter and I'm their granny. But I'm all they have." Maternal Grandmother said that when Andrew came into care, he could not talk, was very aggressive, threw things, and resisted any redirection. Andrew's being around his own siblings caused safety concerns. She added, "I had never seen a child act the way he did . . . . He was doing a lot. . . . I got him after he

12

was two. So his behaviors, . . . they were terrible. He was expressing things, I guess, that he—I didn't understand . . . ." She explained how counseling helped her with Andrew: "I didn't understand what he was doing and how he was[.] I had to be taught myself. I had to have the same therapy[,] . . . and I thank them for it because . . . I didn't know how to deal with him at an early age like that."

But on a more positive note, Maternal Grandmother continued: "He's doing so—he's a totally different child with the help of ECI and the therapist. He's totally different. He talks. He's such a good helper." And regarding his siblings, she said, "He tries to be the big brother. He and his sister—all the siblings, they get along. I mean they are so close." She thought that both the therapy and the stable, safe environment had contributed to Andrew's improvement.

Maternal Grandmother was also concerned about Mother's maintaining her treatment through MHMR, stating, "[T]he visits go . . . pretty smooth but . . . the concern I have is that when she . . . gets really edgy . . . she'll go from zero to 60 in a matter of a second. So . . . if I don't say the right thing—I feel like I'm walking on [eggshells] . . . ." Addressing Mother's medications, Maternal Grandmother said, "I asked her if she's taking her meds because I feel like she's better when she takes them but she always let[s] me know it's none of my business . . . ." "So that's my concern," she continued, "I'm concerned about her being on the meds and being able to be stable mentally . . . to keep them."

Maternal Grandmother wanted to adopt Andrew, Bruce, and Charles so that they could have a safe, permanent home.

### 3. CASA recommends termination.

When the court-appointed special advocate (CASA) volunteer, Lisa Gordon, was asked about Maternal Grandmother, she responded, "What I've seen is discipline, a good[,] . . . stable environment[;] they have . . . their own room, they have routine[,] and I've seen just a significant improvement in their . . . behavior[,] especially [Andrew]." And when asked about Mother, Gordon said that Mother was "somewhat [in] denial" and that she had expressed concerns about being unable financially to care for the children.

And Mayra[8] Guzman, a CASA supervisor, testified much in the same manner as Soto and Maternal Grandmother, stating that when she first saw Andrew, he was aggressive and screaming. "Whenever he wanted something," Guzman said, "he would just cry, get on the floor, [and] throw[] tantrums." Because Andrew behaved so aggressively and because his speech appeared to be delayed, Andrew concerned her. But Guzman testified that after the Department placed Andrew with Maternal Grandmother, she saw major improvements: "[Andrew] was able to verbalize some of his needs, food or whatever he wanted . . . . I started hearing sentences, words. I mean he had major improvements with [Maternal Grandmother]."

---

[8]The reporter's record identifies her as "Myra Guzman." Correspondence from CASA in the clerk's record identifies her as "Mayra Guzman."

Guzman stated that Maternal Grandmother had the ability to provide for the children's physical, emotional, and medical needs and provided a stable environment, something that Guzman thought Mother was incapable of. So that Maternal Grandmother could adopt the children, which was in their best interest, Guzman recommended terminating Mother's parental rights.

**4. Mother opposes termination.**

Mother testified and admitted that Fred visited her home frequently and that there was an emergency protective order against him for an earlier assault on her. She acknowledged that a domestic incident had occurred but maintained that it happened at a different address. (The significance of the different address was Mother's assertion that by moving in with her father, she had removed herself from the situation.)

Mother admitted, however, that she was later charged with a family-violence assault against her father's stepson but noted that she pleaded guilty only to disorderly conduct. Even then, she maintained that she pleaded guilty only because she was "dealing with the system." Mother asserted that it was just a big misunderstanding and only "an argument that escalated."

In addition to the arrest, the "argument that escalated" appeared to have other consequences. Mother admitted being kicked out of her father's home over "an argument and altercation." When asked where she had lived during the case, Mother

15

answered, "I've lived in the homeless area but now I have my own place." Her present housing was provided through the Homeless Coalition.

Referring to a disability hearing that Mother had recently attended, she asserted that she could work only 20 hours a week. Mother maintained that she had had several jobs during the case but admitted having trouble keeping a job. "You guys," she explained, "have traumatized me and destroyed my life. I have a hard time functioning on a job."

Mother claimed that she went to MHMR consistently, that she was prescribed Celexa for depression, that she was taking everything that she was prescribed, and that she took her medication every morning. Mother asserted that she was diagnosed with a major depressive disorder because the Department had taken her children from her. Other than that major depressive disorder, she stated, "I don't have anything else."[9]

Mother attributed Andrew's poor condition when he came into care to his being removed from her home in the middle of the night. She acknowledged that domestic violence may have played a role in his behavior but denied that it played a primary one.

When the Department removed the children on December 29, Mother admitted that the police arrested her for assault on a public servant and for resisting

---

[9]The clerk's record, with references to a bipolar disorder, painted a different picture. At trial, the Department did not challenge Mother's assertion that her diagnosis was limited to a major depressive disorder.

arrest, but she asserted that resisting arrest was the only offense of which she had been convicted. And Mother admitted that Fred was in her closet that day.

According to Mother, her relationship with Fred was off and on between June 2016 and January or February 2017, which was when she purportedly last saw him. He told her that he was moving to Mississippi because that was where he was from.

Arguing against terminating her parental rights, Mother said, "I mean, I love my children. I haven't done anything wrong to my children. I haven't abused them. I'm not on any type of drugs. I mean I love my children. I don't feel like my rights should be terminated."

When asked how her children were doing in Maternal Grandmother's care, Mother answered, "I think they're doing great. My mama is doing a wonderful job."

## IV. Standard of Review

### A. Generally

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures." *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)).

Termination decisions must be supported by clear and convincing evidence. *See* Tex. Fam. Code Ann. § 161.001(b), § 161.206(a); *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012). Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'" *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent-child relationship, the party seeking termination must establish, by clear and convincing evidence, two things: (1) the parent's actions satisfy just one of the many grounds listed in family code § 161.001(b)(1), and (2) termination is in the child's best interest under § 161.001(b)(2). Tex. Fam. Code Ann. § 161.001(b)(1), (2); *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Both elements must be established; that is, termination may not be based solely on the child's best interest as determined by the factfinder. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re C.D.E.*, 391 S.W.3d 287, 295 (Tex. App.—Fort Worth 2012, no pet.).

## B. Best Interest

We acknowledge the strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). To determine the child's best interest, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239,

18

250 (Tex. 2013). The same evidence used to show a subsection (1) ground may be probative when determining best interest under subsection (2). *Id.* at 249; *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). Nonexclusive factors that the factfinder may use when determining the child's best interest include

- the child's desires;

- the child's emotional and physical needs now and in the future;

- the emotional and physical danger to the child now and in the future;

- the parental abilities of the individuals seeking custody;

- the programs available to assist these individuals to promote the child's best interest;

- the plans for the child by these individuals or by the agency seeking custody;

- the stability of the home or proposed placement;

- the parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one; and

- any excuse for the parent's acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *E.N.C.*, 384 S.W.3d at 807. These factors are not exhaustive, and some of them may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one of these factors may suffice in a particular case to support a finding that termination is in the child's best

interest. *See id.* On the other hand, in some cases, the presence of scant evidence relevant to each factor will not support such a finding. *Id.*

### C. Legal Sufficiency

In evaluating the evidence for legal sufficiency in parental-termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the Department proved both the particular ground for termination and that termination is in the child's best interest. *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002); *see In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment, and we resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *J.F.C.*, 96 S.W.3d at 266. We also must disregard all evidence that a reasonable factfinder could have disbelieved, in addition to considering undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* In doing our job, we cannot weigh witness-credibility issues that depend on the witness's appearance and demeanor because that is the factfinder's province. *J.P.B.*, 180 S.W.3d at 573. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.*

## D. Factual Sufficiency

We must perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support terminating a parent-child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the parent violated an alleged ground and that termination was in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *see C.H.*, 89 S.W.3d at 25. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## V. Discussion

### A. Mother does not contest the § 161.001(b)(1) (grounds) findings.

The trial court found grounds for termination under subsections (D), (E), and (M)—that is, that Mother had, respectively, (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being (subsection (D) ground), (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being (subsection (E) ground), and (3) had

21

her parent-child relationship terminated with respect to another child based on a finding that her conduct had violated subsection (D) or (E) of § 161.001(b)(1) of the family code (subsection (M) ground). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (M). Mother does not contest any of these findings.

The same evidence establishing grounds under § 161.001(b)(1) may also help establish best interest under § 161.001(b)(2). *See In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). So from the outset, we have uncontested findings that Mother endangered her children. *See Holley*, 544 S.W.2d at 372.

## B. We reject Mother's public-policy argument.

Mother correctly asserts that the Department considered Maternal Grandmother's finances when deciding how to prosecute the cases, but while we agree that parental rights may not be terminated simply for financial reasons, the record here reveals that financial reasons were not what led to terminating Mother's parental rights. *See In re A.N.*, No. 02-14-00206-CV, 2014 WL 5791573, at *18 (Tex. App.—Fort Worth Nov. 6, 2014, no pet.) (mem. op.). The benefits here were not intended as inducements to terminate but as assurances of stability in the event of termination. *See In re D.S.*, No. 02-15-00350-CV, 2016 WL 1267808, at *9 (Tex. App.—Fort Worth Mar. 31, 2016, no pet.) (mem. op.).

In connection with her public-policy argument, Mother cites no authority. *See In re J.D.*, No. 02-18-00255-CV, 2019 WL 150292, at *3 (Tex. App.—Fort Worth Jan.,

10, 2019, no pet. h.) ("Father cites no direct authority for his public-policy argument that placing a child with a family member should insulate a parent from losing his parental rights. . . . We therefore reject Father's argument."); *In re D.O.*, 338 S.W.3d 29, 38 (Tex. App.—Eastland 2011, no pet.) (rejecting parent's assertion that the state policy was to seek a relative placement over termination and over naming the Department as managing conservator). What is in the children's best interest is the standard. *See* Tex. Fam. Code Ann. § 161.001(b)(2). An underfinanced placement might destabilize its security and permanence. The record suggested that Mother had difficulty supporting herself and that looking to Mother to help support her four children was not a viable option. We reject Mother's argument that the Department cannot consider the postplacement financial implications of various options when deciding how best to proceed in a suit affecting the parent-child relationship. And more critically, as we show below, finances were not the force driving the Department's decision to seek termination. *See A.N.*, 2014 WL 5791573, at *18.

## C. The evidence supports the trial court's best-interest findings under family code § 161.001(b)(2).

If the trial court believed, as Mother asserted, that there was no ongoing domestic violence, that would have weighed in Mother's favor—but the trial court did not have to believe Mother. The factfinder enjoys the right to resolve credibility issues and conflicts within the evidence and may freely choose to believe all, part, or none of any witness's testimony. *In re T.N.*, 180 S.W.3d 376, 382–83 (Tex. App.—Amarillo

23

2005, no pet.). Violence—domestic or otherwise—was a recurring theme in the evidence:

- Domestic violence led to the protective order against Fred.

- Domestic violence precipitated the FBSS case in February 2016.

- The police arrested Mother for assaulting a police officer and resisting arrest at the removal in December 2016.

- The police arrested Mother for family-violence assault against her father's stepson.

- Mother's father kicked her out of his house for an altercation.

And although Mother testified that she and Fred were no longer a couple and that Fred had moved back to Mississippi, the trial court did not have to believe her. *See id.* Even assuming Fred had moved to Mississippi, other evidence suggested that Mother was considering inviting another man—one with an assault conviction—to move into her home. Finally, in both cases we have the trial court's unchallenged findings that Mother endangered the children's emotional and physical well-being under subsections (D) and (E) and that Mother had previously endangered another child's emotional and physical well-being under subsection (M). *See Holley*, 544 S.W.2d at 372.

Mother disputed that anything she had done had ever harmed her children and attributed Andrew's aggressive and violent behavior to the trauma of the removal itself; only grudgingly did she agree that any violence at home played a part in his behavior, and according to her, it played at best only a minor part. But the trial court

24

was free to believe just the opposite—that Andrew's condition was attributable to the violence in Mother's home and that the removal, far from worsening his condition, led directly to his improved condition. *See T.N.*, 180 S.W.3d at 382–83. Notably, Soto, Guzman, and Maternal Grandmother all saw Andrew improve after the removal.

Moreover, the record showed that Mother had instability in her relationship with Fred, instability in keeping a job, and instability in her housing. In contrast, Maternal Grandmother could offer Andrew, Bruce, and Charles both stability and permanence. *See Holley*, 544 S.W.2d at 372. When bringing up a child, stability and permanence are paramount. *In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied).

Viewing the evidence in the light most favorable to the judgment, we hold that a factfinder could reasonably form a firm belief or conviction that terminating Mother's parental rights was in Andrew's, Bruce's, and Charles's best interest, and that the evidence is therefore legally sufficient to support the best-interest findings. *See J.P.B.*, 180 S.W.3d at 573; *see also* Tex. Fam. Code Ann. § 161.001(b)(2).

And based on the entire record and giving due deference to the trial court's findings, we also hold that a factfinder could reasonably form a firm conviction or belief that terminating Mother's parental rights was in Andrew's, Bruce's, and Charles's best interest, and that the evidence is thus also factually sufficient to support the best-interest finding. *See H.R.M.*, 209 S.W.3d at 108; *C.H.*, 89 S.W.3d at 28; *see also* Tex. Fam. Code Ann. § 161.001(b)(2).

We overrule Mother's legal- and factual-insufficiency challenges in both appeals.

## VI. Conclusion

Having overruled Mother's grounds of error, we affirm the trial court's judgments in both causes.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: January 17, 2019